UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRELL SIGGERS,

                 Plaintiff,                          Case No. 19-CV-12521

vs.                                     HON. MARK A. GOLDSMITH

JOSEPH ALEX, et al.,

                 Defendants.

_____/

**OPINION & ORDER**
**(1) GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Dkt. 65) AND (2) DENYING WITHOUT PREJUDICE PLAINTIFF'S AND**
**DEFENDANT'S MOTIONS TO STRIKE**
**(Dkts. 60, 68, 69)**

In 1984, Plaintiff Darrell Siggers was convicted for first-degree murder. Thirty-four years later, Siggers's conviction was vacated, and he was granted a new trial. Three months later, all criminal charges against Siggers were dismissed. This civil rights action followed.

Defendant Joseph Alex, a police officer who allegedly facilitated Siggers's wrongful conviction by fabricating evidence and failing to disclose material exculpatory and impeachment evidence to the prosecutor, has filed a motion for summary judgment (Dkt. 65). Siggers filed a response (Dkt. 84), and Alex filed a reply (Dkt. 87). For the reasons that follow, Alex's motion is granted in part and denied in part.[1] Because the Court's ruling on the motion for summary judgment narrows the issues in this case, the Court denies without prejudice Siggers's motion to strike expert testimony (Dkt. 60) and Alex's motions to strike expert testimony (Dkts. 68, 69), which may be revised and refiled to take into account the summary judgment ruling.

_____

[1] Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

## I. BACKGROUND

### A. Montgomery's Murder

James Montgomery was shot and killed on the night of February 16, 1984, but the events leading up to the shooting are disputed. According to Siggers, before Montgomery was shot, he attended a party at the home of Christine Arnold, the mother of Siggers's children. Siggers, Ranard Jackson, Derek Lawson, Toby Red, Virgil Cook, and William Arnold (Christine Arnold's brother) were also present at the party. Pl. Statement of Additional Material Facts (SAMF) ¶ 2 (Dkt. 84). At some point, a scuffle broke out between Montgomery and Red. Id. ¶ 3. Montgomery brandished a straight razor and attacked Red, who ran off, shouting, "I'll be back; I got something for your ass." Id. Siggers suggests that Red ran off to retrieve a rifle and then headed back towards the party to attack Montgomery. After the scuffle, Christine Arnold and others convinced Montgomery, Jackson, and Lawson to leave the party. Id. When the three men were about a block away from the party, someone emerged from between two houses and began firing a rifle, killing Montgomery; Jackson and Lawson fled the scene. Id. ¶ 4. Siggers suggests that Red shot Montgomery, contending that Red appeared at the nearby home of Jack Fuqua shortly after the shooting occurred while carrying a long gun. Id. ¶ 9.

Alex does not appear to dispute that Montgomery attended a party at Christine Arnold's home on the night that he was murdered. Nor does Alex appear to dispute that a physical altercation broke out that night. However, Alex argues that the altercation was between Siggers and Montgomery—not Red and Montgomery. Def. Statement of Material Facts (SOMF) ¶ 2 (Dkt. 65). According to Alex, after the altercation, Siggers shot Montgomery in the presence of Jackson and Lawson. Id.

**B. Siggers's Prosecution and Conviction**

Siggers was tried and convicted by a jury in July 1984 for Montgomery's murder. Order of Conviction and Sentence (Dkt. 65-1). Alex contends that Siggers's prosecution and conviction were supported by the following facts. First, Jackson and Lawson each identified Siggers as the shooter. Jackson Statement (Dkt. 65-4); Prelim. Exam. Trans. at 6, 11 (Dkt. 65-8); Jackson Trial Testimony at 136, 140–145, 152–154 (Dkt. 65-2); Lawson Trial Testimony at 102–105 (Dkt. 65-3).

Second, law enforcement officials discovered bullet fragment evidence linking Siggers to the murder, upon executing a search warrant for "[t]he lower flat of a structure located at 718 Newport[,] . . . [s]uch structure [being] described as a brick building identified by the addresses of 718-720 Newport." 718 Newport Search Warrant at PageID.1269 (Dkt. 65-5). This "structure" was a duplex with two addresses, 718 and 720 Newport. See id.; 2/1/90 E.D. Mich. Op. at 4–5 (Dkt. 65-27) (describing the layout of the structure). Both 718 and 720 Newport had an upper and lower level. Id. Siggers lived in the lower level of 718 Newport. Id.; see also SAMF ¶ 7 (stating that Siggers's residence at the time of the murder was "718 Newport, #1"). Siggers told an officer, Sergeant Collins, that on another occasion, Siggers had fired a gun "in the vacant apartment across from the hall from his apartment at 720 Newport"—i.e., the lower flat of 720 Newport. Collins Trial Testimony at 41–42 (Dkt. 65-2). The lower flat of 720 Newport is where officers recovered shell casings. Grange Testimony at 78–79 (Dkt. 65-16). Defendant Claude Houseworth of the Detroit Police Department, who was admitted as an expert witness in firearms identification at Siggers's trial, testified that the shell casings recovered from 720 Newport and the shell casings found at the scene of Montgomery's murder were fired from the same gun. Houseworth Testimony at 80–81 (Dkt. 65-2).

### C.  Issues with Siggers's Prosecution and Conviction

Siggers contends that his prosecution and conviction were unconstitutionally tainted by Alex's withholding of material and exculpatory evidence as well as Alex's fabrication of evidence.

According to Siggers, Alex coerced Jackson and Lawson to falsely identify Siggers as the shooter.  Siggers contends that after his trial, Jackson and Lawson each admitted to falsely identifying Siggers as the shooter due to Alex's threats.  Siggers Resp. to SOMF at ¶¶ 2, 10 (citing Spearman Dep. at 11–12 (Dkt. 84-20)).[2]  Siggers also argues that Alex failed to disclose Jackson's and Lawson's criminal histories, which Siggers could have presumably used during his trial to impeach the testimony of these witnesses.

Next, Siggers argues, Alex withheld exculpatory information pointing to the existence of an alternative suspect—Toby Red.  Specifically, Alex allegedly withheld that before trial, Fuqua told Alex that on the night of the murder that (i) Red—who Fuqua described as a "real light" African-American man—appeared at Fuqua's home carrying a rifle, and that (ii) Red told Fuqua that he had "just shot a mother-fucker for starting some shit at Christine's house."  Fuqua 1st Dep. at 11–16 (Dkt. 84-8); Fuqua 2d Dep. at 63 (Dkt. 84-9).[3]  Fuqua purportedly did not testify about Red at trial because Alex coerced Fuqua to not mention Red.

Siggers argues that Fuqua's statements support that Red was the murderer.  Further, Fuqua's statements were corroborated by other evidence that Alex allegedly withheld: Gary Kelly's statement that shortly after the murder he saw a man, who Kelly believed to be his white neighbor, carrying a long gun.  Kelly Trial Testimony at 108 (Dkt. 65-2); Field Notes (Dkt. 84-

---

[2] As discussed below, Bruce Spearman is Jackson's cousin.  Spearman claims that Jackson and Lawson confessed to him that Alex coerced each to falsely identify Siggers as the murderer.

[3] Fuqua was deposed over the course of two days—September 15 and 23, 2020.

11).  Alex interviewed Kelly's white neighbor (Roy Garland) and eliminated him as a suspect, see Field Notes, thereby leaving Red (who, like the man Kelly saw, was light-skinned and was seen carrying a gun shortly after the murder) as a viable alternate suspect.

Finally, Siggers argues that Alex withheld and fabricated evidence that would have undercut the prosecution's evidence connecting the bullet fragments to Siggers.  According to Siggers, based on the search warrant return for 718-720 Newport (which stated the result of the search of Siggers's apartment was "[n]othing [t]aken" and "[d]ry [h]ole"), Alex knew that no bullet evidence was found in Siggers's dwelling.  However, Alex testified that bullet casings were found in "718 Newport."  Alex Trial Testimony at 5 (Dkt. 65-15).  Further, Alex allegedly failed to correct (i) the trial testimony of Officer Gary Grange, who stated that bullet evidence was found in Siggers's apartment building; and (ii) the trial testimony of Houseworth, who stated that the bullets found in the lower apartment flat of 720 were fired from same the gun as bullets found at the scene of Montgomery's murder.  Resp. at 17–18.

### D.  Siggers's Exoneration

For several decades, Siggers filed post-conviction motions in both state and federal court, to no avail.[4]  However, on July 19, 2018, the state court entered a stipulated order vacating Siggers's murder conviction on the basis of "newly discovered evidence"—specifically, a new report authored by a firearms expert (David Townshend) criticizing Houseworth's trial testimony regarding the bullet casings as implausible—as well as the independent investigation of the

---

[4] These post-conviction motions include: (i) a motion for a new trial in 1985 (Dkt. 65-25); a federal habeas petition in 1989 (Dkt. 65-26); a federal habeas petition in 1996 (Dkt. 65-33); a motion for authorization to file a second habeas petition in 1996 (Dkt. 65-35); a motion to file a successive habeas petition in 1998 (Dkt. 65-37); a motion for relief from judgment in 2004 (Dkt. 65-39); a motion to file a successive habeas petition in 2008 (Dkt. 65-44); and a motion for relief from judgement in 2016 (Dkt. 65-54).

Conviction Integrity Unit of the Wayne County Prosecutor's Office (Dkt. 65-57).  Further, on

October 19, 2018, upon motion of the Wayne County Prosecutor's Office, the state court entered

an order dismissing the criminal charges against Siggers (Dkt. 84-18).

On August 27, 2019, Siggers filed this lawsuit against Alex and the personal representative

of Houseworth's estate.[5]  See Compl. (Dkt. 1).  Siggers brings claims against Alex for (i)

fabrication of evidence, in violation of Siggers's Fourth and Fourteenth Amendment rights; (ii)

malicious prosecution, in violation of Siggers's Fourth Amendment rights; and (iii) failure to

disclose material exculpatory and impeachment evidence as required by Brady v. Maryland, 373

U.S. 83 (1963), in violation of his Fourteenth Amendment rights.  See Am. Compl. (Dkt. 36).

## II.  MOTION STANDARDS

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact

exists when there are "disputes over facts that might affect the outcome of the suit under the

governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as

to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).  "Where

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986).  The moving party may discharge its burden by showing "that there is an absence

of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325

(1986).

---

[5] Houseworth is deceased.

### III.  ANALYSIS

Alex argues that he is entitled to summary judgment for several reasons: (i) all of Siggers's claims are barred by collateral estoppel; (ii) Siggers's due process claims fail because the criminal prosecution did not end in Siggers's favor, and there is no admissible evidence showing that Alex fabricated evidence or withheld exculpatory evidence; (iii) Siggers's malicious prosecution claim fails because the criminal prosecution did not end in Siggers's favor, and there was probable cause to prosecute Siggers; (iv) Alex is entitled to qualified immunity; and (v) the continuation of these proceedings violates Alex's due process rights.  The Court considers each argument in turn.

#### A.  Collateral Estoppel

Alex contends that Siggers's claims in this lawsuit are barred by collateral estoppel.  That doctrine "bars subsequent relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit." Cobbins v. Tenn. Dep't of Transp., 566 F.3d 582, 589 (6th Cir. 2009).  According to Alex, federal law dictates that the prior federal decisions on Siggers's habeas petitions retain preclusive effect, and that Michigan law dictates that the prior state court decisions on Siggers's motion for a new trial and motions for relief from judgment independently retain preclusive effect.  Mot. at 13–19.

The Court first addresses Alex's argument that, under federal law, Siggers is precluded from relitigating issues raised in his prior federal habeas petitions and motions.  In Chandler v. Louisville Jefferson Cnty. Metro Gov't, a district court within this circuit—applying federal law—addressed the question of whether a prior federal habeas opinion that was based on a now-vacated state court ruling precluded relitigating issues in a subsequent federal civil rights action.  The court answered the question in the negative:

> Everyone seems to agree that because the state rulings are vacated, those state court proceedings no longer are accorded preclusive effect.  See Dodrill v. Ludt, 764 F.2d

7

> 442, 444 (6th Cir. 1985). Such a rule makes sense conceptually. One of the elements of collateral estoppel is that the issue in question was subject to a final decision on the merits. Vacating the underlying decision itself and its confirmation on appeal prevents compliance with this element.
>
> In their consideration of Plaintiff's habeas petition, [the federal judges] reviewed the state court proceedings and rulings which are now vacated. They made no de novo findings or rulings, but rather, in an effort to make a determination regarding the reasonableness of the state court's decision, reviewed the state court findings and rulings which are now literally banished to judicial netherland. Considering the nature of habeas proceedings, particularly the deference given to state court findings of fact and law, this Court is unconvinced that a federal court's habeas rulings based upon discredited and vacated state proceedings are worthy of preclusive effect.

No. 3:10–CV–470–H, 2011 WL 781183, at *2 (W.D. Ky. Mar. 1, 2011). For the reasons articulated in <u>Chandler</u>, this Court declines to give any preclusive effect to the prior federal habeas opinions, as they were based on Siggers's now-vacated state court conviction.

Alex contends that notwithstanding that the prior federal decisions do not preclude relitigating issues in this case, the prior state decisions independently preclude relitigating issues in this case under Michigan law. Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts are required to "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S. 75, 81 (1984) (punctuation modified). The preclusive effect of a state court judgment is determined by state law. <u>See</u> <u>id.</u>

Michigan law allows "crossover estoppel," which, as relevant here, precludes the re-litigation of an issue from a criminal proceeding in a subsequent civil proceeding. <u>Barrow v. Pritchard</u>, 597 N.W.2d 853, 855–856 (Mich. Ct. App. 1999). In Michigan, collateral estoppel applies when (i) an issue essential to the judgment has been actually litigated and determined by a valid and final judgment; (ii) the same parties have had a full and fair opportunity to litigate the issue; and (iii) there is mutuality of estoppel. <u>See</u> <u>Monat v. State Farm Ins. Co.</u>, 677 N.W.2d 843,

845–846 (Mich. 2004).  However, mutuality is not required when collateral estoppel is being invoked defensively as it is here.  Id. at 844–845, 850.[6]  The party invoking collateral estoppel bears the burden of proving that the doctrine applies.  See Cent. Transp., Inc. v. Four Phase Sys., Inc., 936 F.2d 256, 260 (6th Cir. 1991).

Siggers argues that under Peterson v. Heymes, 931 F.3d 546 (6th Cir. 2019), the prior state court rulings do not retain any preclusive effect.  In that case, after an exoneree's rape and murder convictions were vacated, the exoneree brought a § 1983 action against various state officials, including police officers.  The defendants argued that the plaintiff-exoneree was collaterally estopped from relitigating the voluntariness of his confession because the state court judge had found his confession admissible during a suppression hearing held before the jury trial.  The Sixth Circuit rejected this argument.  Applying Michigan law, the Sixth Circuit held that the trial court's interlocutory rulings (including the pretrial ruling on the admissibility of the confession) merged with the final judgment, and since the final judgment had been vacated, the interlocutory rulings were vacated as well.  Id. at 554.  The court concluded that because vacated rulings have no preclusive effect under Michigan law, the interlocutory rulings likewise did not have any preclusive effect.  Id.

Alex contends that Peterson is distinguishable, arguing that the state court rulings at issue in this case are post-judgment rulings, unlike the pre-judgment rulings that were at issue in Peterson.  Mot. at 16.  However, Alex cites no authority to support his novel argument that following vacation of a judgment, only the judgment and the pre-judgment rulings lose their preclusive effect.  Nor does Alex provide any reason why post-judgment rulings based upon a

---

[6] Defensive use of collateral estoppel denotes a situation where a defendant seeks to avoid re-litigating an issue that was previously defended successfully against the same plaintiff or the plaintiff's privy.  See Monat, 677 N.W.2d at 850.

now-vacated criminal judgment should continue to retain preclusive effect after the underlying criminal judgment has been vacated and the criminal charges dismissed. As a result, Alex has failed to carry his burden of proving that the prior post-judgment state court rulings preclude litigation of any issues in this case.

Moreover, there is authority that affirmatively undercuts Alex's position. In <u>Dukes v. City of Albany</u>, 289 F. Supp. 3d 387 (N.D.N.Y. 2018), a plaintiff was wrongfully convicted of murder. After the state court vacated his conviction and dismissed the murder charge against him, the plaintiff brought a § 1983 action against police officers and detectives who allegedly helped to secure his wrongful conviction by coercing false witness testimony and inducing the plaintiff to sign a false confession. The defendants argued that because the plaintiff had raised the issue of the voluntariness of his confession on several prior occasions—in a pre-trial hearing, at trial, on appeal in state court, and in a federal habeas petition—collateral estoppel barred the plaintiff from litigating the issue again in the § 1983 action. The plaintiff argued that the vacatur of his murder conviction prevented that criminal judgment, as well as any of the post-conviction decisions reviewing it, from having any preclusive effect in the subsequent civil action. The district court agreed with the plaintiff, explaining that "Defendants' interpretation of collateral estoppel seems plainly wrong—a vacated criminal conviction cannot have preclusive effect. . . . Furthermore, the judgment of any court tasked with a review of that now-vacated criminal conviction likewise has no preclusive effect." <u>Id.</u> at 393.

This Court agrees with the <u>Dukes</u> court: post-judgement rulings by a state court do not retain any preclusive effect after the criminal conviction upon which the post-judgment rulings were based is vacated. Accordingly, Alex is not entitled to summary judgment based on his theory that the prior state court and federal court rulings bar litigation of Siggers's claims in this action.

### B.  Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Due Process Clause is violated when the prosecution withholds material exculpatory or impeachment evidence from a criminal defendant.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  The Due Process Clause of the Fourteenth Amendment is also violated when evidence is knowingly fabricated. Gregory v. City of Louisville, 444 F.3d 725, 737 (6th Cir. 2006).  Because fabrication-of-evidence claims and Brady withholding-of-evidence claims have different elements (the former involves manufacturing or damaging evidence, and the latter involves suppressing favorable evidence), the two claims must be analyzed separately.  See Mills v. Barnard, 869 F.3d 473, 484–485 (6th Cir. 2017) (holding that the district court erroneously combined a plaintiff's fabrication-of-evidence and Brady withholding-of-evidence claims into one claim).

Here, Siggers alleges that Alex violated the Due Process clause by both (i) withholding material exculpatory evidence and (ii) fabricating evidence.  Each claim is addressed in turn.

### i.  Withholding of Evidence

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Prosecutors are not the only state actors bound by Brady.  As relevant here, "police can commit a constitutional deprivation analogous to that recognized in Brady by withholding or suppressing exculpatory material."  Moldowan v. City of Warren, 578 F.3d 351, 379 (6th Cir. 2009).  "[P]olice officers fulfill their Brady obligations as long as they inform the prosecutor about evidence that

undermines the state's preferred theory of the crime." D'Ambrosio v. Marino, 747 F.3d 378, 389 (6th Cir. 2014) (punctuation modified).   Thus, proof that certain material evidence was not admitted at trial is insufficient to prove that a police officer failed to comply with his Brady obligations; rather, such proof shows only that the prosecutor failed to satisfy the prosecutor's Brady obligations.  See Carter v. City of Detroit, 678 F. App'x 290, 294 (6th Cir. 2017).

Siggers contends that Alex violated Brady by withholding the following evidence: (i) Kelly's statement about a "light-skinned man carrying a rifle by his next-door neighbor's garage who Kelly thought was his white neighbor" and Alex's verification that Kelly's white neighbor (Garland) was not the man that Kelly saw; (ii) Jackson's conviction history (indicating a conviction for Larceny Under $100), Lawson's larceny conviction, and Lawson's alias, "Gary Lawson"; (iii) Fuqua's statement that Red came to Fuqua's house shortly after the shooting carrying a long rifle, Fuqua's description of Red as 5'6" to 5'7" and "real light [skinned]," and Alex's threatening of Fuqua with criminal prosecution (for illegal possession of a gun and drugs) if Fuqua mentioned Red at trial; (iv) Alex's search warrant return (which stated the result of the search of Siggers's apartment was "[n]othing [t]aken" and "[d]ry [h]ole") and Alex's failure to correct Grange's trial testimony that bullet evidence was found in Siggers's apartment; and (v) Alex's knowledge that "DPD [Detroit Police Department] firearms expert[] Claude Houseworth's testimony revealed glaring flaws and misstatements (that a bullet demonstrating four lands and grooves and a bullet with 12 lands and grooves were fired from the same gun, which is a physical impossibility)."  Resp. at 18–20.  Each allegedly withheld piece of evidence is considered in turn.

### a.  Kelly's Statements and Alex's Elimination of Garland as a Suspect

Siggers contends that Alex failed to disclose (i) Kelly's statement that he saw a white man carrying a rifle right after Montgomery was murdered and (ii) that Alex eliminated Kelly's white

neighbor (Garland) as a suspect.[7]   Siggers suggests that this information is exculpatory because

the information—in combination with Fuqua's statement that he saw Red, a light-skinned African-

American man, carrying a long gun shortly after the murder occurred—supports the theory that

Red was an alternate suspect.  According to Siggers, Alex's handwritten "field note" contained the

omitted information about Kelly's neighbor, and this note was not turned over to the prosecutor.

Alex argues that the allegedly omitted information was not exculpatory and, even if it were,

Siggers cannot prove that Alex failed to disclose this information to the prosecutor.  The Court

disagrees with Alex.

First, Siggers's theory is that Kelly's statements and Alex's elimination of Garland as the

man whom Kelly saw are material because—when considered with Fuqua's statements about

Red—this evidence points to Red as a legitimate, alternative suspect:

> Gary Kelly told [Alex] about a light-skinned man carrying a rifle by his next-door
> neighbor's garage who Kelly thought was his white neighbor and Alex verifying
> that the white neighbor was not outside with a long gun.  These notes show Alex
> eliminated the white next-door neighbor, Roy Garland, leaving a light-skinned man
> carrying a rifle (the alternate suspect) unaccounted for; a light-skinned man who
> matched the description of Toby Red (5'6" – 5'7", "real light") that Jack Fuqua had
> given Alex.
>
> . . .
>
> Combining the Gary Kelly "white neighbor with gun" evidence (that the white
> neighbor refuted, thereby leaving a light-skinned man with a long gun unaccounted
> for) with the Jack Fuqua evidence that he told Alex about Toby Red coming over
> after the shooting with a long gun []Toby Red was described as "real light," would
> now place a man with a motive to shoot at James Montgomery as the shooter.

---

[7] To be clear, Siggers admits that Alex did disclose to the prosecutor Kelly's signed statement that
Alex had written out on Kelly's behalf; however, this statement did not indicate that the man Kelly
saw was carrying a gun or that Alex had eliminated Garland as a suspect.  See Kelly Statement
(Dkt. 84-12).

Resp. at 18–19, 34 (original emphasis omitted).  It was clearly established by the time that the

murder investigation began in February 1984 that evidence of a legitimate second suspect is

material, exculpatory evidence under <u>Brady</u>.  <u>See</u> <u>Gumm v. Mitchell</u>, 775 F.3d 346, 364 (6th Cir.

2014) (holding that alternate suspect evidence is subject to <u>Brady</u>'s disclosure requirements);

<u>Carrillo v. Cnty. of Los Angeles</u>, 798 F.3d 1210, 1224–1225 (9th Cir. 2015) (holding that the

exculpatory nature of alternative suspect evidence was clearly established by the time a murder

investigation began in January 1984).

Second, Siggers has put forward evidence that, taken in the light most favorable to Siggers,

shows that Alex failed to disclose to the prosecutor Kelly's complete statements and Alex's

elimination of Garland as a suspect.  Although Alex testified that he turned over Kelly's statements

to the prosecutor, <u>see</u> Alex Dep. at 67 (Dkt. 84-4), Siggers points out that these statements do not

contain any of Kelly's information about the man Kelly saw carrying a gun, <u>see</u> Kelly Statement

(Dkt. 84-12).

By contrast, Alex's field notes contain such information.  In Alex's field note, there is an

arrow drawn from Gary Kelly's name to a note that states: "seen neighbor = Roy Garland w/m/45

blu sht outside by garage w/ l. gun."  Field Notes.[8]  There is also a line drawn from Garland's name

to a note that states: "denies being outside w/ gun."  <u>Id.</u>  Significantly, the field note contains the

following handwritten statement: "info reg. gun did not come out in trial."  <u>See id.</u>[9]

The significance of the "info reg. gun did not come out in trial" statement is that it indicates

that the field note was written after trial.  Unlike Kelly's statement—which Alex testified he

---

[8] Taken in the light most favorable to Siggers, "w/m/45" presumably means "white male, age 45";
"blu sht" means "blue shirt"; and "w/ l. gun" means "with long gun."

[9] Taken in the light most favorable to Siggers, "info reg. gun" presumably refers to Kelly's
statement that the person he saw on the night of the murder was carrying a gun.

disclosed to the prosecutor—Alex did not clearly testify in his deposition that he turned over these field notes to the prosecutor before the trial had concluded; in fact, Alex conceded that he would not have disclosed notes taken after trial to the prosecutor during trial. See Alex Dep. at 68. Taken in the light most favorable to Siggers, this evidence supports Siggers's position that Alex never disclosed to the prosecutor Kelly's statements about Red or Alex's elimination of Garland as the man whom Kelly saw on the night of the murder.

Alex is, therefore, not entitled to summary judgment on the Brady claim insofar as this claim is based on Siggers's theory that Alex withheld Kelly's statements about Red and Alex's elimination of Garland as a suspect.

### b. Criminal Convictions of Jackson and Lawson and Lawson's Alias

Siggers contends that Alex ran criminal background checks on Jackson and Lawson and discovered Jackson's prior convictions "for arson and larceny," Lawson's history of "similar crimes," and Lawson's alias, "Gary Lawson." Pl. SAMF ¶ 5. However, Siggers argues, the background checks were never disclosed to the defense. Id. Alex contends that he did not withhold this evidence, arguing that (i) "[t]here is no evidence that [Jackson's criminal history] . . . was run by Alex or known to him" and (ii) defense counsel specifically questioned Lawson at trial about the date and nature of his convictions, which defense counsel could not have known without having possession of Lawson's criminal history. Def. Resp. to Pl. SAMF ¶ 5 (Dkt. 87).

Alex is correct that Jackson's criminal record does not indicate the name of the police officer who ran the criminal background check. See Jackson Criminal Record (Dkt. 84-2). Because Siggers does not point to any other evidence to show that Alex knew of this information, Siggers cannot prove that Alex failed to disclose it to the prosecutor.

Lawson's criminal record also does not indicate the name of the officer who ran the background check.  See Lawson Criminal Record (Dkt. 84-3).  Further, Alex is correct that at trial, Siggers's defense counsel questioned Lawson about his criminal convictions, and Lawson testified that he was convicted of "B and E and CCW."  Lawson Testimony at 108.  Defense counsel then expressly asked Lawson whether Lawson was convicted on June 21, 1984 for breaking and entering with intent to commit larceny; Lawson answered "yes."  Id.  Lawson's testimony comports with his criminal record, which reflects that on June 21, 1984, Lawson was convicted of "CCW/P" and "B+E/DW."  See Lawson Criminal Record at PageID.4831.[10]  The exchange between defense counsel and Lawson demonstrates that defense counsel was apprised of Lawson's criminal history.  Further, whether or not the defense knew this information from Lawson's background check is irrelevant.  This is because "there is no Brady violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source."  United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007).  Because defense counsel was able to question Lawson regarding his criminal record at trial, the defense must have "kn[own] . . . the essential facts" regarding Lawson's criminal convictions; whether the defense gained knowledge of these facts from Lawson's criminal record or "another [available] source" is inconsequential.  See id.

Because Siggers points to no other evidence to show that the criminal histories were never disclosed to the defense, Siggers cannot prove that Alex failed to disclose the information to the prosecutor.  Further, Siggers points to no evidence to prove that Alex failed to disclose Lawson's alias that is listed in the criminal background check.  Accordingly, Alex is entitled to summary

---

[10] Presumably, "CCW" stands for "carrying a concealed weapon" and "B+E/DW" stands for "breaking and entering with a deadly weapon."

judgment on Siggers's Brady claim to the extent that it is based on a theory that Alex failed to disclose Jackson's and Lawson's criminal histories and Lawson's alias to the prosecutor.

### c. Fuqua's Statements and Alex's Threat to Fuqua

Siggers contends that Alex failed to tell the prosecutor about: (i) Fuqua's statement that shortly after the shooting, Red appeared at Fuqua's home—which was located just down the block from Christine Arnold's home—with a long gun, (ii) Fuqua's description of Red, and (iii) Alex's threat to Fuqua to not mention Red at trial. Siggers points to Fuqua's deposition testimony to establish that Fuqua made these statements to Alex and another officer (whom Fuqua did not identify by name). Pl. SAMF ¶ 9. Indeed, Fuqua testified that (i) he told the officers that Red entered Fuqua's home with a rifle, Red was looking for Christine Arnold's brother (William), and Red told Fuqua that he "just shot a mother-fucker for starting some shit at Christine's house"; (ii) Fuqua described Red's physical appearance to the officers (that Red was "real light" and "[a]bout 5'6"/7""—not "too tall"); and (iii) Alex and the other officer told Fuqua to "forget" about Red, that "Little Man was the person that did the shooting," and that Fuqua "was not to tell anyone about Toby Red"—if Fuqua did, the officers threatened that they would "make sure [he] went back to prison." Fuqua 1st Dep. at 11–16 (Dkt. 84-8); Fuqua 2d Dep. at 63 (Dkt. 84-9).

Alex argues that Siggers has not put forth any evidence showing that Alex failed to disclose Fuqua's statements to the prosecutor. Mot. at 27. As noted above, Alex testified that he turned over all witness statements to the prosecutor. Alex Dep. at 67. However, Siggers argues that Fuqua's statement (which Alex reduced to writing) did not contain Fuqua's comments about Red. Although Siggers did not produce Fuqua's statement to support this argument, Siggers points to Fuqua's deposition transcript wherein counsel questioned Fuqua about his affidavit—made by Fuqua in June 2000—which in turn references Fuqua's statement:

> Q: [The affidavit] says, on the way to court, [Alex] gave me a copy of my written statement. . . . Officer Alex told me to stick to the statement. And if I said anything about Toby Red, he would make sure I went back to prison. Is that true?
>
> A: Yes, sir.
>
> . . .
>
> Q: So a conversation you had on the way down was, if you testify anything contrary to your written statement, which didn't mention Toby Red, bad things were going to happen to you by the police?
>
> . . .
>
> A: Yes, sir.

Fuqua 1st. Dep. at 19, 23. Fuqua's deposition testimony at least creates a genuine factual issue as to whether Alex failed to disclose Fuqua's information about Red to the prosecutor.

Alex does not expressly address the charges that (i) Alex threatened Fuqua to not mention Red at trial and (ii) Alex failed to disclose this threat to the prosecutor. The Court need not consider any argument that the movant did not raise—i.e., whether Siggers can prove that Alex made such threats and failed to disclose them to the prosecutor. See Quintana v. Santa Fe Cnty. Bd. of Comm'rs, 973 F.2d 1022, 1028 (10th Cir. 2020) (holding that district court is "under no obligation" to consider an argument that the movant did not raise). Nor will the Court sift through the record to see if a genuine dispute exists as to these issues. See Emerson v. Novartis Pharm. Corp., 446 F. App'x 733, 736 (6th Cir.2011) ("'[J]udges are not like pigs, hunting for truffles' that might be buried in the record.") (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)). By failing to address whether he threatened Fuqua and whether he disclosed this threat to the prosecutor, Alex has failed to carry his burden as the movant of demonstrating the absence of a

genuine dispute of these material facts.  See Fed. R. Civ. P. 56(a).  He has thus not shown that he is entitled to judgment as a matter of law on these issues.[11]

Accordingly, Alex is not entitled to summary judgment on the Brady claim insofar as it is based on a theory that Alex withheld Fuqua's statements regarding Red as well as threats to Fuqua.

### d.  The Search Warrant Return and Grange's Testimony

Siggers argues that Alex knew, based on the search warrant return, that nothing was discovered in the search of 718 Newport, but "failed to correct" Grange's testimony that firearms evidence was found in that apartment.  Resp. at 12, 19 (citing Grange Trial Testimony at 72, 74 (Dkt. 84-6)).  The search warrant return indicates that "nothing [was] taken" from "718 Newport" and that the result of the search was negative (described on the return as a "dry hole").  718 Newport Search Warrant Return at PageID.4884–4885 (Dkt. 84-7). Alex argues that Siggers's defense counsel (Timothy Murphy) was aware of the search result.  Mot. at 26, 28.  To support his argument, Alex points to Murphy's testimony during the June 21, 1985 hearing on Siggers's motion for a new trial; Murphy testified that he knew that the bullet evidence was recovered from 720 Newport, not 718 Newport.  SOMF ¶ 30 (citing Murphy Testimony at 18–20 (Dkt. 65-22)).

Although not raised by Alex, it is worth noting, as a preliminary matter, that Siggers appears to be incorrect that Grange falsely testified about the location of the bullet casings.  In the portion of Grange's testimony cited by Siggers, Grange testified that he searched "apartment number two" and that the casing was "lying on the floor in the . . . dining room of this apartment number two which would be located alongside the north wall of the dwelling at 718 Newport."

---

[11] Alex argues that "Siggers was appointed a private investigator to interview witnesses on his behalf, and so any information . . . Fuqua had was also available to him."  Mot. at 28.  However, if it is shown that Alex did threaten Fuqua to not implicate Red, this would strongly negate Alex's argument that the investigator could have discovered Fuqua's information about Red by simply interviewing Fuqua.

Grange Trial Testimony at 72–74.[12]  It is clear that Grange did not testify that the bullets were found in Siggers's dwelling (the lower flat of 718 Newport), as he testified that they were found in "apartment number two," which was located "alongside the north wall of the dwelling at 718 Newport."

In any event, Alex is correct that Murphy's testimony from the 1985 evidentiary hearing clearly shows that the defense was aware that the bullet evidence was taken from 720 Newport, not 718 Newport:

> Q: [T]he testimony in the trial to the jury did not indicate that the evidence came from 720, is that correct?
>
> A: Sergeant Alex'[s] testimony didn't.  I think that the evidence technician [Grange] clearly indicated that the bullets he found did not come from the premises where it was alleged that Mr. Siggers lived.
>
> . . .
>
> Q: [D]uring the course of . . . [Alex's] testimony - - do you have reason to believe that the evidence was taken from somewhere else?
>
> . . .
>
> A: It was taken from the lower flat in Apartment 720 . . . .  Before trial . . . it had been vacant . . . .
>
> Q: All right, so you were aware in your mind that the evidence was taken - - didn't come from 718?
>
> A: I was aware that the cartridges didn't come from 718.
>
> . . .
>
> Q: Now during the course of the trial why did you not object to that testimony, stating that it came from 718?

---

[12] As noted above, Collins testified that Siggers admitted that he had fired a gun "in the vacant apartment across from the hall from his apartment at 720 Newport"—i.e., the lower flat of 720 Newport.  Collins Trial Testimony at 41–42.

A: Because it was - - I thought clear - - . . . from the testimony of Officer Grange and Sergeant Alex that in fact they had entered two separate apartments at this premises, that the one from which they obtained the evidence that was admitted during trial relating to the cartridges or casing was taken from an apartment that was vacant . . . at no time did the prosecution claim that those bullets or those casings came from the apartment of where Mr. Siggers lived, although they did claim they came from the building in which he lived.

. . .

Q: Did Mr. Siggers, during the course of the testimony indicate to you they were making a mistake, that that stuff did not come out of my apartment?

A: Yes.

Q: You did not object.

A: I cross examined.

Q: You didn't clarify that the evidence didn't come out of 718?

A: I thought that it was perfectly clear to everyone where those cartridges or casings came from was not the premises where Mr. Siggers lived.

Q: Mr. Murphy, did you go down and get a return on the warrant, the search warrant on 718 Newport?

A: I think I did.

. . .

Q: Let the record show I'm showing Mr. Murphy the return of the search . . . [for] 718 Newport . . . could you plea[se] read into the record what Sergeant Alex indicated.

A: . . . I know what it says, he said it was a dry hole. There was nothing there.

Murphy Testimony at 13–22.

"[T]here is no Brady violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." Graham, 484 F.3d at 417. Alex has shown, through Murphy's testimony, that the defense knew that the bullet evidence was not discovered in Siggers's

dwelling.  Siggers has not come forward with any evidence that would create a genuine question of fact as to whether the defense knew this information during the murder trial.

Accordingly, Alex is entitled to summary judgment on the <u>Brady</u> claim insofar as it is based on Siggers's theory that Alex violated <u>Brady</u> by withholding evidence regarding the "dry hole" result of the search of 718 and failing to correct Grange's testimony regarding the result of the search.

### e. Houseworth's Testimony

In his response brief, Siggers argues that according to his police practices expert, Waller, "any reasonably-trained police officer who went through police academy training would know the fundamentals of how firearms work and would have known that Claude Houseworth's glaring misrepresentation at trial (that a bullet demonstrating four lands and grooves and a bullet with 12 lands and grooves were fired from the same gun, which is a physical impossibility) should have been disclosed to the prosecutor because it countered the prosecutor's theory that physical evidence at Plaintiff's residence matched evidence at the scene of the crime."  Resp. at 36.  Alex argues that he cannot be held responsible for failing to correct Houseworth's testimony because Alex was not a firearms expert, suggesting that he lacked the requisite knowledge to know how to identify the issues with Houseworth's testimony.  <u>See</u> Reply at 6 (noting that in Siggers's complaint, Siggers acknowledges that Alex was not an expert in firearms identification) (citing Am. Comp. ¶ 38).

A police officer does not violate <u>Brady</u> where he fails to disclose information that he does not know.  <u>See</u> <u>Youngblood v. W. Va.</u>, 547 U.S. 867, 869–870 (2006) (holding that a <u>Brady</u> violation occurs where the police know information that should have been disclosed but fail or refuse to inform the prosecutor).  However, the Court need not decide whether Siggers has raised

a triable issue as to whether Alex knew of the "glaring" issues with Houseworth's testimony. As discussed below, Alex is entitled to summary judgment on this Brady claim for a different reason.

Siggers did not allege in his complaint that Alex violated Brady by failing to disclose "glaring" issues with Houseworth's testimony.[13] Rather, Siggers alleged that Houseworth was the one who "deliberately and knowingly chose not to disclose to the prosecutor in pre-trial meetings the apparent exculpatory evidence that the bullet found in the victim's body did not, and could not have, come from the same firearm as the bullet fragment purportedly found in the Newport St. search." Am. Comp. ¶ 51. Additionally, Siggers alleged that "[b]ecause of HOUSEWORTH's concealment of apparent Brady evidence regarding his lack of qualifications, the prosecutor relied on HOUSEWORTH to provide trial testimony that the bullets found at the scene and purportedly in Plaintiff's apartment matched the bullet that was found in the victim's body." Id. ¶ 58.

Thus, Siggers did not allege that Alex knew or should have known of the falsity of Houseworth's testimony—or that Alex violated Brady by failing to disclose such to the prosecutor—until his response to the instant motion for summary judgment. "A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." Tucker v. Union of Needletrades, Indus., & Textile Emps., 407 F.3d 784, 788 (6th Cir. 2005) (punctuation modified, citation omitted). As a result, the Court properly declines to consider Siggers's allegation raised for the first time in his response brief. See

---

[13] Although Siggers alleges that "[t]he fact that the bullet found during the Newport St. search did not match the bullet found in the victim (because the number of lands and grooves were not the same) would have been apparent to any reasonable firearms identification expert," Am. Compl. ¶ 53, he simultaneously alleges that Alex was not a firearms identification expert, id. ¶ 38. Thus, ¶ 53 of Siggers's amended complaint cannot be read as an allegation that Alex knew that Houseworth's testimony was implausible.

23

Patterson v. Outback Steakhouse of Fla., LLC, No. 17–5035, 2017 WL 9604534, at *3 (6th Cir. Oct. 25, 2017).

### ii. Fabrication of Evidence

To prove that a defendant fabricated evidence in violation of the Due Process Clause, a plaintiff must prove (i) that the defendant knowingly fabricated the evidence and (ii) that a reasonable likelihood exists that the false evidence would have affected the decision of the jury. Gregory, 444 F.3d at 737.[14]

Siggers argues that Alex fabricated (i) Jackson's identification of Siggers as the murderer (by threatening and coercing Jackson to identify Siggers as the murderer), (ii) Lawson's identification of Siggers as the murder (by threatening and coercing Lawson to identify Siggers as the murderer), and (iii) "[t]hat bullet casings were found in 718 Newport that were later matched to bullet evidence found at the scene of the shooting and matched the bullet recovered from the victim's body." Resp. at 17–18.

Alex contends there is no admissible evidence to prove that he fabricated the Jackson or Lawson identifications, nor is there a reasonable likelihood that the bullet evidence would have

---

[14] As a preliminary matter, Alex argues that Siggers must also show that the criminal prosecution ended in his favor in order to prevail on his fabrication-of-evidence claim. Mot. at 19. Alex is incorrect. A fabrication-of-evidence claim does not require a plaintiff to prove that the plaintiff's prior criminal proceedings terminated in his or her favor. See Hoskins v. Knox Cnty., Ky., No. 17-84-DLB-HAI, 2018 WL 1352163, at *15 (E.D. Ky. Mar. 15, 2018) (explaining that whereas a claim for malicious prosecution requires a showing that a prior criminal prosecution ended in a plaintiff's favor, a fabrication-of-evidence claim does not require such a showing). The case that Alex cites in support of his argument—McDonough v. Smith, 139 S. Ct. 2149 (2019)—does not hold otherwise. Rather, McDonough merely held that the statute of limitations for a fabrication-of-evidence claim begins to run when the criminal proceedings against the petitioner terminate in his favor, as is the case in the analogous context of malicious prosecution claims. See id. at 2155–2156.

affected the jury's decision.  Mot. at 21–23.  For the reasons discussed below, the Court agrees with Alex.

### a. Jackson and Lawson Identifications

Siggers points to Spearman's deposition testimony to support Siggers's argument that Alex threatened and pressured Jackson and Lawson to falsely identify Siggers as the shooter.  By way of background, Spearman, an inmate who was incarcerated at the Michigan Reformatory Correctional Facility at the same time as Siggers in 1986 or 1987, stated during his deposition that he overheard Siggers say that Jackson falsely testified against him.  Spearman Dep. at 5–6.  After realizing that the "Jackson" referenced by Siggers was Spearman's cousin, Spearman called Jackson on the phone to ask him about his testimony.  Id. at 8.  According to Spearman, Jackson confessed that he had falsely testified that Siggers was the shooter.  Id. at 8–10.  Jackson told Spearman that he did so because the police came to his home on two occasions and threatened him.  Id. at 11–12.  Additionally, Spearman stated that he spoke to Lawson, who allegedly also admitted to Spearman that he had fabricated his identification of Jackson.  Id. at 16.  When counsel asked Spearman in his deposition whether Lawson told Spearman "anything like [Jackson] did about a cop threatening him," Spearman answered: "Well, he said whatever [Jackson] said . . . ." Id.

Alex argues that the Jackson and Lawson statements to Spearman are inadmissible as hearsay.  Hearsay is any out-of-court statement that is offered to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801.  If a statement qualifies as hearsay, it is inadmissible unless a hearsay exception applies.  "[T]he burden of proving that the statement fits squarely within a hearsay exception rests with the proponent of the hearsay exception."  United States v. Arnold, 486 F.3d 177, 206 (6th Cir. 2007) (punctuation modified, citation omitted).  Generally, hearsay

cannot be considered on a motion for summary judgment. See Wiley v. United States, 20 F.3d 222, 225–226 (6th Cir. 1994).

Here, both Jackson and Lawson made their alleged statements to Spearman outside of court, and Siggers is offering the statements to prove the truth of the matters asserted—that Jackson and Lawson falsely identified Siggers as the shooter and that Alex coerced them to do so. Thus, the statements that Jackson and Lawson made to Spearman are inadmissible hearsay unless a hearsay exception applies.

Alex, anticipating that Siggers would argue that a hearsay exception applies, contends that the Jackson and Lawson statements are not admissible under Rule 804(b)(3)—the "statement against interest" exception to hearsay. Mot. at 22. Indeed, Siggers states in a footnote in his response brief—without further explanation—that "[t]he statement of Ranard Jackson is admissible pursuant to Fed. R. Evid. 804(b)(3), a 'Statement Against Penal Interest.'" Resp. at 29 n.11. Siggers does not address the admissibility of Lawson's statement.

Siggers has clearly failed to carry his burden of proving the applicability of any hearsay exception to Lawson's statement. Even if Siggers had argued that the hearsay exception contained in Rule 804(b)(3) applies to Lawson's statement, this argument would be quickly rejected. Rule 804(b)(3) is inapplicable to Lawson's statement for the simple reason that it applies only where a hearsay declarant is "unavailable" as a witness. Neither party contends that Lawson is unavailable.

Jackson, however, is unavailable. According to Alex, Jackson is deceased. Mot. at 22. Under Rule 804(a)(4), a witness's "death" renders that witness unavailable. With this threshold requirement met, the Court assesses whether the other requirements of the statement against interest hearsay exception are met.

Pursuant to Rule 804(b)(3)(a), if a declarant is unavailable, the declarant's statement is not barred by the rule against hearsay where "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability."  Siggers offers no explanation as to how Jackson's statement satisfies this standard.  Nevertheless, it is apparent that the Rule 804(b)(3) applies to part of Jackson's statement, but not all of it.  Only those particular portions of a statement that inculpate the declarant—not his entire narrative—are admissible under Rule 804(b)(3).  See Williamson v. United States, 512 U.S. 594, 599–600 (1994).  Here, Jackson's alleged statement that he testified falsely against Siggers could clearly subject him to perjury charges or a civil lawsuit from Siggers.  See Beckett v. Ford, 384 F. App'x 435, 444 (6th Cir. 2010) (holding that a declarant's statement that he "had no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of" clearly subjected the declarant to perjury charges or civil lawsuit by Beckett because the declarant "testified at Beckett's murder trial implicating Beckett in the murder") (punctuation modified).  By contrast, Jackson's statement that the police coerced him to perjure himself is not a statement against interest.  See id. (holding that the declarant "did not incur any criminal or civil liability by stating that he was threatened by Forrester[, a police officer], that Forrester and Anderson[, the prosecutor] coached his testimony, or that Anderson promised that he would be released from prison in exchange for testifying falsely").

In sum, acknowledging prior testimony as false may be against a declarant's penal interest, but explaining why the false testimony was given would not be.  The explanation is an attempt to mitigate or negate the wrongfulness of the prior perjury, and thus the explanation actually supports the declarant's interest in avoiding or limiting any criminal punishment for his prior perjury.  Thus,

only Jackson's statement that he falsely testified against Siggers is admissible under Rule 804(b)(3).

However, because Siggers has not shown that Jackson's other statement—that the police coerced him to falsely testify—is admissible under any hearsay exception, he is left only with evidence that shows that Jackson perjured himself. In other words, Siggers lacks any evidence to show that Alex fabricated Jackson's testimony by coercing Jackson to commit perjury. Alex is, therefore, entitled to summary judgment as to Siggers's claim that Alex fabricated evidence by coercing Jackson and Lawson to falsely identify Siggers as the shooter.

### b. Bullet Fragment Evidence

Siggers argues that Alex fabricated evidence "that bullet casings were found in 718 Newport that were later matched to bullet evidence found at the scene of the shooting and matched the bullet recovered from the victim's body." Resp. at 17. Siggers appears to be referring to Alex's trial testimony; in his complaint, Siggers alleges: Alex "falsely reporting that a bullet fragment had been found in Plaintiff's apartment when, in fact, the result of the search was a "dry hole;" i.e., nothing was found." Am. Compl. ¶¶ 76–77.

Siggers is correct that Alex testified at trial that he "recovered shell casings . . . from an apartment flat at 718 Newport . . . ." Alex Trial Testimony at 5. However, it is not enough to show that the defendant fabricated evidence; rather, to succeed on a fabrication-of-evidence claim, a plaintiff must also show that a reasonable likelihood exists that the false evidence would have affected the decision of the jury. Gregory, 444 F.3d at 737.

Here, there is very little evidence that this false testimony caused the jury to believe that the casings came from Siggers's dwelling. Rather, the record evidence demonstrates that despite the false testimony, it was clear that the shell casings were not recovered from Siggers's dwelling.

First, as Alex points out, Siggers's own defense lawyer testified that even though Alex misstated where the shell casings were discovered, it was perfectly clear during the trial, based on the testimony of others such as Grange, that the shell casings were discovered from the vacant apartment located in the lower flat of 720 Newport.  Murphy Testimony at 13–22.

Second, Murphy testified during his deposition (taken on August 31, 2020) that, "[i]f that jury didn't understand the ballistics efforts—the ballistics evidence had come from Apartment Number 2 and that Mr. Siggers didn't live there, I just wasted five days of trial.  I thought it was abundantly clear, abundantly clear, that the ballistics evidence did not come from Siggers' apartment."  Murphy Dep. at 84 (Dkt. 65-60).

Third, during the 1985 hearing, the state judge who presided over the 1984 trial also stated that "[i]t was quite obvious throughout the trial to anybody who was here in the court room and listened to the testimony that those shells came from 720, a vacant apartment.  We don't know what the real number was, we knew it was a vacant apartment.  It was not the apartment that this man lived in."  Murphy Testimony at 41.[15]

Thus, the record evidence strongly supports the fact that despite Alex's statement that shell casings were recovered from "an apartment flat at 718 Newport," the record was otherwise clear that the shell casings were actually recovered from the apartment next to Siggers's.  Siggers fails to point to any evidence to rebut this conclusion.  Thus, Alex is entitled to summary judgment on the fabrication-of-evidence claim to the extent it is based on Siggers's theory that Alex fabricated evidence regarding where the bullet evidence was discovered.

---

[15] The prosecution did not need Alex's misstated testimony—that the shell casings were recovered from Siggers's unit—to connect Siggers to the shell casings.  Rather, the prosecution was able to connect Siggers to the shell casings through, for instance, Collins's testimony that Siggers admitted to firing a gun in the vacant unit next to Siggers's.

### C. Malicious Prosecution

Siggers argues that because Alex fabricated evidence, Alex can be held liable for malicious prosecution. See Resp. at 28. Under federal law, a plaintiff must prove four elements to establish a malicious prosecution claim: (i) that a criminal prosecution was initiated against the plaintiff and that the defendant "made, influenced, or participated in the decision to prosecute"; (ii) that the state lacked probable cause for the prosecution; (iii) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (iv) that the criminal proceeding was "resolved in the plaintiff's favor." Sykes v. Anderson, 625 F.3d 294, 308–309 (6th Cir. 2010).

Alex challenges Siggers's ability to prove that the criminal prosecution ended in Siggers's favor (the fourth element) or that the prosecution was supported by probable cause (the second element). The Court addresses the challenges to the fourth and second elements in turn and concludes that Siggers's malicious prosecution claim fails for the following reason: While the prosecution ended in his favor, Siggers is unable to show a triable issue of fact that Alex fabricated evidence. As a result, Siggers has not shown a lack of probable cause, and his malicious prosecution claim necessarily fails.

### i. The End of the Criminal Prosecution

Alex contends that the criminal prosecution did not end in Siggers's favor. Siggers argues that it did. Both parties rely on Jones v. Clark Cnty., Ky, 959 F.3d 748 (6th Cir. 2020) to support their respective positions. In Jones, the Sixth Circuit relied on the Restatement (Second) of Torts to distinguish between dismissals that end in a criminal defendant's favor and those that do not. The court concluded that "the abandonment of the proceedings because the accuser believes that the accused is innocent or that a conviction has, in the natural course of events, become impossible or improbable, is a sufficient termination in favor of the accused." Jones, 959 F.2d at 764

30

(punctuation modified).  By contrast, proceedings against a plaintiff do not terminate in the plaintiff's favor where the plaintiff "paid restitution in exchange for a dismissal of the theft charge brought against him."  Id.  In other words, "[i]n order for a termination of proceedings to be favorable to the accused, the dismissal must be one-sided and not the result of any settlement or compromise."  Id. (punctuation modified).

Alex argues that Siggers "bought peace"—i.e., that Siggers's prosecution was abandoned not due to his innocence but due to a compromise that Siggers entered into with the prosecutor—and, therefore, the criminal prosecution did not terminate in Siggers's favor.  Alex mischaracterizes the nature of the stipulated order vacating Siggers's murder conviction.  That order states that the conviction was vacated due to "newly discovered evidence," thereby indicating that the conviction was vacated because the prosecutor believed the newly discovered evidence created a possibility that Siggers was innocent, or at least rendered the chances of conviction impossible or improbable.  Further, the prosecutor's dismissal of the charges following the stipulated order was not the product of compromise or settlement; Siggers gave nothing in return for the dismissal of the charges.

The criminal prosecution, therefore, terminated in Siggers's favor.  As a result, Alex is not entitled to summary judgment on the malicious prosecution claim based on his theory that the prosecution ended unfavorably to Siggers.

### ii.  Probable Cause

As noted above, in February 1984 Jackson told Alex that Little Man shot Montgomery, and Cook told Alex that 718 Newport was Little Man's residence.  Further, on March 8, 1984, Jackson testified at a preliminary hearing that he observed Little Man shoot Montgomery, and Jackson identified Siggers as Little Man.  At the conclusion of Jackson's testimony, the state judge

found there was probable cause to charge Siggers with Montgomery's murder.  Prelim. Exam. Trans. at 26.

Alex's sole argument is that "[t]he state district court's probable cause finding at the conclusion of the preliminary examination establishes as a matter of law that there was probable cause for Siggers' prosecution."  Mot. at 30.  To support his position, Alex cites Peet v. City of Detroit, 502 F.3d 557, 566 (6th Cir. 2007).  In Peet, the Sixth Circuit affirmed the district court's decision to grant summary judgment on a malicious prosecution claim due to the judicial determination of probable cause following the evidentiary preliminary hearing.  Peet's holding was an application of collateral estoppel; the court explained, "[w]hile that determination has no preclusive effect if there is evidence that the claim of malicious prosecution is based on a police officer's supplying false information to establish probable cause, there is no evidence in this record that [the officer-defendant] or the county prosecutor or anyone else supplied the magistrate judge at that hearing with false information to establish probable cause."  Id. (citation omitted).

Peet does not prove Alex's entitlement to summary judgment in this case.  As explained above, under Peterson, the trial court's interlocutory rulings merged with the final judgment, and since Siggers's conviction has been vacated, all other rulings based on the vacated judgment—including the judicial determination of probable cause—are vacated as well.

However, Alex is nevertheless entitled to summary judgment.  As noted above, Siggers bases his malicious prosecution claim on Alex's alleged fabrication of evidence.  Specifically, Siggers argues that Alex fabricated evidence by coercing Jackson and Lawson to falsely identify Siggers as the shooter and by falsely testifying about where shell casings were discovered.  As discussed above, the Court finds that Siggers fails to raise a triable fact regarding his fabrication-of-evidence claim.  Because Siggers is unable to show that Alex fabricated evidence, he necessarily

cannot show that the prosecution lacked probable cause.  Absent the requisite showing of a lack of probable clause, Siggers's entire malicious prosecution claim fails.  Thus, Alex is entitled to summary judgment on the malicious prosecution claim.

### D.  Qualified Immunity

The parties dispute Alex's entitlement to qualified immunity.  The Court's qualified immunity analysis is confined solely to the claims that survive the summary judgment ruling articulated above, which include Siggers's <u>Brady</u> claim based on Siggers's theories that (i) Alex failed to disclose Kelly's statements and Alex's elimination of Garland as a suspect and (ii) Alex failed to disclose Fuqua's statements or Alex's threat to Fuqua.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Qualified immunity provides government officials "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1244 (2012) (punctuation modified, citation omitted).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987).  Although the burden is on the defendant to initially raise the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.  <u>Sheets v. Mullins</u>, 287 F.3d 581, 586 (6th Cir. 2002).

To determine whether a police officer is entitled to qualified immunity, the Court applies a two-prong test: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." Mullins v. Cyranek, 805 F.3d 760, 765 (6th Cir. 2015) (punctuation modified).  The prongs may be addressed in any order, id.; the Court takes the second prong first.

There is no doubt that today, it is clearly established that evidence of a legitimate second suspect is material, exculpatory evidence under Brady.  See Gumm, 775 F.3d at 364.  However, the pertinent inquiry is whether this Brady obligation was clearly established in 1984.  The Sixth Circuit has recognized that since 1964—well before Montgomery's murder in February 1984—it has been clearly established that police officers have a Brady-derived duty to disclose evidence to the prosecutor when the "exculpatory value" of the evidence is "apparent."  See Moldowan, 578 F.3d at 382, 388.  Further, it was clearly established by 1984 that the exculpatory value of evidence suggesting the existence of an alternative suspect is apparent.  See Carrillo, 798 F.3d at 1224–1225 (holding that it was clearly established—before a murder investigation began in January 1984—that withholding alternative suspect evidence violates Brady).  Likewise, it was clearly established by 1984 that "impeachment evidence, such as the fact that a witness was coerced into making a fabricated statement, qualifies as exculpatory."  Jackson v. City of Cleveland, 925 F.3d 793, 824 (6th Cir. 2019) (holding that this was clearly established by 1975) (citing Giglio v. United States, 405 U.S. 150, 153–155 (1972)).  Thus, a reasonable police officer in 1984 would have understood that he was violating Brady by withholding and suppressing alternative-suspect evidence from the prosecutor.

Because the right was clearly established by 1984, Alex is entitled to qualified immunity only if the facts—taken in the light most favorable to Siggers—show that Alex's conduct did not violate <u>Brady</u>.  As discussed above, there is a factual issue as to whether Alex withheld Fuqua's statements regarding Red (an alternative suspect) and whether Alex coerced Fuqua to not mention Red at trial.  "Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."  <u>Sova v. City of Mt. Pleasant</u>, 142 F.3d 898, 903 (6th Cir. 1998); <u>see also</u> <u>Heflin v. Steart Cnty., Tenn.</u>, 958 F.2d 709, 717 (6th Cir. 1992) (explaining that where there is a genuine issue of material fact "involving the question on which [qualified] immunity turns, then summary disposition is improper and the case must go to trial").  Accordingly, genuine issues of material fact preclude granting Alex summary judgment based on qualified immunity.

### E.  Alex's Due Process Rights

Alex argues that the continuation of this action violates his due process rights because, with the passage of time, several witnesses are now deceased; the firearms evidence has been destroyed; and portions of the trial court's file and the prosecutor's file no longer exist.  Mot. at 34–35.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o <u>State</u> shall . . . deprive any person of life, liberty, or property, without due process of law."  As the United States Supreme Court has explained, the Due Process Clause is not violated by private action:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.  The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

DeShaney v. Winnebago Dept. of Social Servs., 489 U.S. 189, 195 (1989).  Thus, the one case that

Alex cites in support of his argument—Mathews v. Eldridge, 424 U.S. 319, 333 (1976)—is easily

distinguishable.  Matthews involved due process concerns raised by the government's termination

of a private individual's Social Security benefits.  Here, by contrast, Alex complains of the effect

of a lawsuit brought by a private actor, Siggers.  Because the Due Process Clause does not protect

Alex from private action,  Alex is not entitled to summary judgment based on his due process

concerns.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Alex's motion for

summary judgment (Dkt. 65).  Specifically, the Court grants Alex's motion as to all claims other

than Siggers's Brady claim to the extent that it is based on the theories that (i) Alex withheld

Kelly's statements regarding seeing a man with a rifle on the night of the murder and Alex's

elimination of Garland as the man whom Kelly saw, and (ii) Alex withheld Fuqua's statements

regarding Red and threatened Fuqua to not mention Red at trial.

Because the Court's ruling on the motion for summary judgment significantly narrows the

relevant issues in this case, and because the Court wants to be presented only with expert testimony

issues that need to be decided in light of the narrowed issues, the Court denies without prejudice

the parties' motions to strike (Dkts. 60, 68, 69).  To the extent the parties still wish to have the

Court resolve expert testimony issues, they must file revised motions to limit or exclude expert

testimony within 14 days of this opinion.

SO ORDERED.

Dated: September 24, 2021                    s/Mark A. Goldsmith
Detroit, Michigan                                MARK A. GOLDSMITH
                                                 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 24, 2021.

s/Jennifer McCoy
Case Manager